PATERSON, ZOCHONIS (U.K.) LTD. et al., Plaintiff,

v.

COMPANIA UNITED ARROWS, S.A., Sea Queen Lines, Sea Queen Corp., Ltd., China Ocean Shipping Company and Mitsui O.S.K. Lines, Ltd., Defendants.

Nos. 77 Civ. 4770 (LBS), 77 Civ. 5129 (LBS), 78 Civ. 1064 (LBS), 78 Civ. 1138 (LBS) and 78 Civ. 1197 (LBS).

United States District Court, S. D. New York.

Feb. 21, 1980.

Donovan, Maloof, Walsh & Kennedy, Richard E. Repetto, Bigham, Englar, Jones & Houston, William R. Connor, III, New York City, for various cargo plaintiffs.

Crowell, Rouse & Varian, Francis R. Matera, New York City, for plaintiff, N. V. Handelsvereeniging Reiss & Co.

Kirlin, Campbell & Keating, John B. Conway, New York City, for defendant, Mitsui O.S.K. Lines, Ltd.

## OPINION

SAND, District Judge.

Currently before the Court in this complicated maritime cargo claim proceeding is defendant Mitsui O.S.K. Lines, Ltd.'s ("Mitsui"'s) motion for an order enforcing the forum selection clause contained in Mitsui's bills of lading by "declining jurisdiction and venue and dismissing the [four] complaints against" it.[1] Alternatively, Mitsui seeks dismissal on the ground of *forum non conveniens*. The Court finds that the forum selection clause is enforceable. Consequently, plaintiffs' contractual claims against Mitsui in 77 Civ. 5129, 78 Civ. 1064, 78 Civ. 1138 and 78 Civ. 1197[2] are dismissed for improper venue pursuant to F.R.Civ.P. 12(b)(3). Plaintiffs' non-contractual claims against Mitsui in the same actions are dismissed on *forum non conveniens* grounds subject to the conditions stated herein. Because the "facts" in these actions change almost as frequently as the Court receives new papers or hears another argument, we once again begin by addressing the factual background despite the fact that we have already dealt with these matters in two previous opinions (January 30, 1980 and January 30, 1979).

These consolidated actions involve claims by some forty cargo plaintiffs, all of whom are foreign corporations seeking to recover losses stemming from the sinking of the M. V. Sea Queen I ("Sea Queen"), a vessel apparently controlled by a Hong Kong corporation.[3] The ship's cargo, some of which originated in the People's Republic of China ("PRC") but was transshipped at Hong Kong, was taken on board at Hong Kong and other Asian ports, and was intended to be discharged at Lagos, Nigeria or other unspecified West African ports. The China Ocean Shipping Company ("Cosco"), originally a defendant in these actions, arranged the transshipment and apparently issued to plaintiffs "through bills of lading" on both Cosco and Mitsui forms covering that portion of the cargo originating in PRC.[4] In an opinion dated January 30, 1980, this Court dismissed the complaints against Cosco under the Foreign Sovereign Immunities Act of 1976. 28 U.S.C. § 1602 *et seq*. The other defendants, Sea Queen's owners and operators (the "Sea Queen defendants"), have defaulted. Sea Queen apparently issued its own bills of lading for all cargo taken on board regardless of whether a Cosco or Mitsui through bill of lading covering the same cargo had already been issued.[5]

---

1. Mitsui form bills of lading generally provide for the resolution of disputes under Japanese law by the Tokyo District Court in Japan.

2. Seven complaints alleging cargo loss have been consolidated into 77 Civ. 4770. Mitsui is named as a defendant only in the complaints filed under the four index numbers listed above.

3. The Sea Queen was apparently owned by Compania United Arrows, S.A., a Peruvian corporation, and was operated by Sea Queen Corporation, Ltd., a Hong Kong corporation. "Sea Queen Lines", originally named as a defendant in some of these actions, is the same entity as Sea Queen Corp., Ltd. Default judgments against these "Sea Queen defendants" were entered by the Court in April and May of 1979.

4. Both the Cosco and Mitsui bills were "through bills" in that they covered the entire voyage from PRC to West Africa. Both types of bills provided for transshipment at Hong Kong. Cosco's issuance of Mitsui form bills is discussed further at note 10, *infra*.

5. It is not clear whether all of the Sea Queen bills covered cargo covered by another bill of lading or whether only Sea Queen bills were issued for some or all of the cargo originating outside PRC. In light of our conclusion that plaintiffs are not holders of the Sea Queen bills,

This Court's involvement with these matters began in October, 1977 when the Sea Queen defendants filed a complaint in the Southern District of New York seeking exoneration from or limitation of liability for losses arising out of the sinking of their vessel. In addition to filing claims in the limitation proceeding, plaintiffs filed complaints in seven separate actions seeking recovery from some or all of the original defendants herein.[6] The limitation proceeding was eventually dismissed, and in April and May of 1979, a default judgment was granted against the Sea Queen defendants in each of the seven cargo complaints. As has already been noted, the claims against Cosco were dismissed on January 30, 1980.

There has been considerable confusion from the outset as to the basis upon which plaintiffs seek to hold Mitsui liable. Much of the confusion stems from the fact that three different types of bills of lading were issued for the cargo ultimately loaded aboard the Sea Queen: Mitsui bills which provide generally for the resolution of disputes in Tokyo, Japan; Cosco bills which provide for the resolution of disputes in PRC, and Sea Queen bills which give the "carrier" the right to litigate in New York. Adding to the confusion was plaintiffs' apparent and perhaps understandable reluctance, in light of the lack of information as to who was responsible for the issuance of which bills of lading, to specify on which bills they sought to hold Mitsui liable. Plaintiffs' earlier insistence that their claims against Mitsui were based at least partially on the Sea Queen bills led this Court to deny Mitsui's original motion for dismissal on *forum non conveniens* grounds.[7] Plaintiffs now appear to concede, albeit obliquely, that their claims rest primarily on the Mitsui bills.[8] Moreover, undisputed facts recently brought to the attention of the Court concerning the issuance and function of the Sea Queen bills of lading lead the Court to conclude that plaintiffs cannot base their claims against Mitsui upon those bills.[9]

Although the parties disagree as to the nature of the relationship between the respective defendants,[10] it now seems clear that Mitsui was a "co-adventurer" and alter ego of the Sea Queen.

the question is not relevant to the disposition of this case. *See* discussion, *infra.*

**6.** There is actually disagreement between the parties as to whether the limitation proceeding was filed prior or subsequent to the cargo complaint. The question has no bearing on the issues before us.

**7.** Three of the four original complaints appeared to predicate Mitsui's liability on the Sea Queen bills. Since Mitsui did not argue that the New York choice of forum provision could be invoked by the carrier alone and since the Court found that the provision was enforceable under the standards set forth in *The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1971), Mitsui's *forum non conveniens* motion was denied without focusing on the standards set forth in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947). *See Paterson, Zochonis (U.K.) Ltd., et al. v. Compania United Arrows, S.A., et al.*, D.C., 493 F.Supp. 621, 77 Civ. 4770 (LBS) (January 30, 1979).

**8.** This concession was made, *inter alia*, at the oral argument held December 14, 1979. In recently amended complaints, a number of the plaintiffs also assert negligence on the part of Mitsui in "selecting" the Sea Queen and alleged

**9.** The Court emphasizes, however, that the information before it even at this late date is sketchy. As has already been noted, it is unclear, even after several appearances before the Court, whether any of plaintiffs' cargo was covered solely by Sea Queen bills of lading. Thus, the description of the Sea Queen bills that follows pertains to that portion of ship's cargo covered by more than one bill of lading.

**10.** Prior to June, 1975, Mitsui carried a cargo between PRC and Nigeria via Hong Kong on a regular basis. Unable thereafter to continue such service, Mitsui "introduced" Sea Queen Corp. Ltd. to China National Chartering Corp. of Peking ("CNCC") as an alternative carrier of this cargo. (The reasons for Mitsui's inability to continue the service in question do not concern us at this time.) Consequently, from July 1975, Sea Queen Corp. Ltd. carried cargo from PRC to Nigeria via Hong Kong, and Mitsui continued to act as an intermediary between CNCC and Sea Queen Corp. Ltd. Under the terms of an "advisor/consultant" agreement with the latter company, Mitsui was paid a fee by Sea Queen Corp. for the performance of these intermediary services.

that the Sea Queen bills were issued by Sea Queen or its agents to the various shippers or their agents. None of the plaintiffs claim to be a holder or recipient of a Sea Queen bill, and the Court concludes that those bills were never negotiated to or held by any of the plaintiffs. At least in the case of cargo originating in PRC, a "through" bill of lading covering the entire voyage was issued by Cosco, and the Sea Queen bill was issued to Cosco's agents in Hong Kong. The Sea Queen bills so issued thus served as receipts between carrier and shipper, and are not a valid basis for a cause of action by cargo plaintiffs who never held them. *See, e. g., Atlantic Banana Co. v. M. V. Calanca*, 342 F.Supp. 447 (S.D. N.Y.1972) (a bill of lading issued by a carrier to a shipper who is also a charterer is a "mere receipt"). Had the plaintiffs been holders of the Sea Queen bills, and if, as seems likely, a genuine issue of fact exists as to Mitsui's role in the operation of the Sea Queen, this Court might well have allowed a suit against Mitsui on the Sea Queen bills to proceed.[11] *See Joo Seng Hong Kong Co., Ltd. v. S. S. Unibulkfir, et al.*, D.C., 483 F.Supp. 43 (1979). Given the facts currently presented to the Court, however, it is clear that plaintiffs' claims against Mitsui cannot rest upon the Sea Queen bills and must rest instead upon the Mitsui bills and the recently alleged non-contractual claims.[12]

### The Mitsui Forum Selection Clause

In an opinion dated January 30, 1979, this Court held that it would be inappropriate to enforce the Mitsui forum selection clause in a context where most of the plaintiffs predicated Mitsui's liability on the Sea Queen bills of lading and where Mitsui itself denied that its bills were relevant to plaintiffs' claims.[13] Mitsui was granted leave to renew its motion to dismiss if it turned out that the Mitsui bills were the sole contractual basis upon which Mitsui's liability could be predicated. It now appears that this is, in fact, the case.

We therefore address the forum selection clause contained in the Mitsui bills of lading and conclude that it is enforceable and that these actions should be dismissed for improper venue pursuant to F.R.Civ.P. 12(b)(3).

A freely negotiated forum selection clause is enforceable absent a showing by the party opposing enforcement that the clause is either unreasonable under the circumstances or the product of fraud, overreaching, mistake or coercion. *The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972); *Gaskin v. Stumm Handel*, 390 F.Supp. 361 (S.D.N.Y. 1975). Plaintiffs have not made any such

---

Plaintiffs claim that Mitsui in some way controlled Sea Queen Corp., and it is this claim which apparently forms the basis for their attempt to hold Mitsui liable on the Sea Queen bills of lading. Since plaintiffs are admittedly not holders of Sea Queen bills, however, *see* discussion *infra*, we need not inquire further into the relationship between Sea Queen Corp. and Mitsui insofar as plaintiffs' claims on the Sea Queen bills of lading are concerned. At this point, we address neither the contention that Mitsui is liable to plaintiffs in negligence because it selected the Sea Queen nor the contention that Mitsui is liable for the acts of Sea Queen Corp. because it is Mitsui's "alter ego". *See* note 8 *supra*.

Finally, the Court notes that the historical relationship between Mitsui and PRC shipping authorities would be relevant to a claim that Mitsui is liable on Cosco bills of lading as well as to the attempt to hold Mitsui on its own bills admittedly issued by Cosco. In light of our

conclusion as to the contractual basis for plaintiffs' claims, however, neither an ultimate resolution of these matters, nor of the question whether Cosco's issuance of the Mitsui bills was authorized, is necessary to a determination of the questions currently before the Court.

11. The validity and effect of the choice of forum provision in the Sea Queen bills would first have to be considered.

12. *See* note 8, *supra*. It is not clear whether any of the plaintiffs still seek to hold Mitsui liable on the Cosco bills of lading. Since plaintiffs have not specifically addressed that question and since the focus of the most recent argument and papers has been on the Mitsui and Sea Queen bills, the Court now concludes that plaintiffs' contractual claims rest solely on the Mitsui bills of lading.

13. *See* note 7, *supra*.

showing.[14]  In order to show that the clause is unreasonable, plaintiffs must establish "that trial in the contractual forum [Tokyo, Japan] will be so gravely difficult and inconvenient that [they] will for all practical purposes be deprived of [their] day in court." *The Bremen v. Zapata Off-Shore Co.*, 407 U.S. at 18, 92 S.Ct. at 1917.  Plaintiffs' allegations fail to satisfy this test.

This case, which has absolutely no connection with either New York or the United States, is before this Court solely because Sea Queen's owners, who are no longer parties, chose to file a limitation proceeding here.  Under the circumstances plaintiffs, all of whom are foreign corporations, are hard pressed to argue that Tokyo is so much more inconvenient than New York that they will be deprived of their day in court if forced to litigate there.  Indeed, Tokyo is much closer than New York to the events surrounding and the witnesses involved in this essentially Far Eastern dispute.[15] Plaintiffs' assertions concerning the likelihood of delay in the Japanese courts and the convenience of New York as a forum are unconvincing and irrelevant.  No evidence of delay has been presented.  Moreover, the relevant issue is not whether New York is a convenient forum but whether the

forum chosen by the parties is so inconvenient as to meet the *Bremen* test.[16]

At oral argument, plaintiffs also raised the question of how their claims would be treated by a Japanese court.  Plaintiffs were particularly concerned with whether a waiver or extension of the statute of limitations by Mitsui would be honored.  Competing affidavits by experts on Japanese law have been submitted, but a supplemental affidavit by plaintiffs' expert puts him substantially in accord with defendant's expert on the waiver question.  In light of both these affidavits and Mitsui's representation [17] that it will waive the relevant statute of limitations in Japan, the Court concludes that plaintiffs will not be put to any foreseeable, serious procedural or substantive disadvantage as a result of the enforcement of the Tokyo forum selection clause.[18]

Ironically, the strongest potential argument for nonenforcement appears in Mitsui's papers.  If Cosco's issuance of the Mitsui bills was in fact unauthorized, the Court would have serious reservations as to whether the forum selection clause could be said to have been freely negotiate between Mitsui and the plaintiffs.  Plaintiffs vigorously contend, however, that Cosco's act

14.  Some of the plaintiffs have made conclusory allegations of overreaching and have described this as an adhesion situation in which Mitsui, as the "carrier", is clearly in a position of superior bargaining power.  While the Mitsui bills are standard printed forms with the choice of forum provision included among a number of "boilerplate" terms, the vagueness of plaintiffs' allegations combined with the commercial context of this transaction leads the Court to reject the overreaching argument.  Accepting plaintiffs' present argument without more specific allegations of overreaching would be tantamount to voiding all forum selection clauses contained in typical ocean bills of lading.

15.  Most of the events relevant to a resolution of this dispute occurred in Hong Kong, which is also the residence of many of the potential witnesses.  Indeed, Hong Kong is probably the most logical place for this litigation to continue.  There is no requirement, however, that a contractually agreed upon forum be the *most* convenient one.

16.  Plaintiffs also allege that the Mitsui forum selection clause is "vague", and that under the circumstances of this case, the Mitsui bill acts

to incorporate the provisions of the Sea Queen bills.  The Court fails to see any vagueness in the Mitsui forum selection clause.  Moreover, the Court agrees with defendant's counsel that the incorporation argument is inapposite here.  Plaintiffs, who were never holders of the Sea Queen bills, would seem in any event to derive little benefit from a forum selection clause giving the *carrier* the right to litigate in New York.

17.  Although the parties have contested the question whether a waiver by Mitsui will be honored in a Japanese court, there is no indication in the papers presently before us whether Mitsui has in fact waived the statute of limitations applicable to plaintiffs' contractual claims.  In a previous motion, however, Mitsui clearly represented to the Court that it had, in fact, executed such a waiver and the Court now assumes that this is the case.

18.  Plaintiffs will, of course, suffer the disadvantage of having to begin this litigation anew in another forum.  This kind of disadvantage, however, results whenever a contested forum selection clause is enforced.

was authorized, and that Cosco in fact acted as Mitsui's agent. The burden of establishing non-enforcement is on plaintiffs, and plaintiffs here postulate a straightforward commercial transaction between themselves and Mitsui's "agent". The Court thus concludes that the Mitsui bills were "freely negotiated", and that there is no basis for not enforcing the Mitsui forum selection clause.

*CONCLUSION*

Defendant Mitsui's motion to enforce its forum selection clause is granted, and the contractual claims against Mitsui in the above mentioned complaints are dismissed for improper venue.[19] Although this technically leaves plaintiffs' non-contractual claims before the Court, these claims too have absolutely no connection with this forum and are in fact ancillary to the main contractual claims now to be litigated in Japan. There is no doubt that both the contractual and non-contractual claims should be litigated before the same forum, and that both types of claim focus on the relationships between parties located in the Far East.[20] Plaintiffs non-contractual claims are thus dismissed on the ground of *forum non conveniens* subject to Mitsui's agreement to suit on those claims in Tokyo, Japan, and waiver of the applicable statute of limitations.[21]

Settle order on notice.

---

**19.** *See* note 21, *infra.*

**20.** For the contractual claims, the focus is on the Mitsui-Cosco relationship; for the non-contractual, on the Mitsui-Sea Queen relationship. *See* note 10, *supra.*

**21.** This Court will retain jurisdiction and place the matter on its suspense docket to be restored to the active calendar in the event that the Tokyo District Court fails to give effect to Mitsui's waiver of the statute of limitations. If the actions in Japan are commenced, plaintiffs are to advise the Court whether the Tokyo court gives effect to Mitsui's waiver.