**ASOMA CORPORATION,
Plaintiff–Appellant,**

v.

**SK SHIPPING CO., LTD., Defendant–
Cross–Claimant–Appellee,**

**Columbia Shipmanagement Ltd. and
Pelagos Shipping, Ltd., Defendants–
Cross–Claimants–Appellees,**

**M/V Faros, her Engines, Boilers,
Tackle, Etc., Defendant.**

**Docket No. 05–5308–cv.**

United States Court of Appeals,
Second Circuit.

Argued: March 22, 2006.

Decided: Oct. 24, 2006.

See also 53 Fed.Appx. 581.

Steven P. Calkins, Kingsley, Kingsley & Calkins, Hicksville, NY, for Plaintiff–Appellant Asoma Corporation.

Randolph H. Donatelli, Cichanowicz, Callan, Keane, Vengrow & Textor, LLP, New York, NY, for Defendant–Cross–Claimant–Appellee SK Shipping Co., Ltd.

Peter J. Gutowski, Freehill, Hogan & Mahar, LLP, New York, NY, for Defendants–Cross–Claimants–Appellees Columbia Shipmanagement Ltd. and Pelagos Shipping, Ltd.

Before LEVAL, B.D. PARKER, Circuit Judges, and SESSIONS, District Judge.*

B.D. PARKER, Circuit Judge.

This admiralty case arose from seawater damage to steel coils shipped from Taiwan to the United States, and we must decide in which country the case should be heard. Two separate contracts of carriage, with two different forum selection clauses, potentially govern. Defendant–Appellee SK Shipping Co., Ltd., as "time chartered owner," entered into a charter party (the "contract of charter," "voyage charter" or "charter party") leasing a vessel to Metall und Rohstoff Shipping London Ltd. ("MUR London") for shipment of the cargo. The contract identified the "charterer" as MUR London, or its "nominee." MUR London nominated Plaintiff–Appellant Asoma Corporation ("Asoma"). The charter party contains a forum selection clause which requires that claims for cargo loss or damage be litigated in the United States District Court for the Southern District of New York. When the steel coils were subsequently loaded onto SK Shipping's vessel, the *M/V Faros*, in Taiwan, SK Shipping issued bills of lading to Yieh Loong Enterprise Co., Ltd., the manufacturer, which consigned the cargo. The bills of lading require that litigation be brought in Seoul, South Korea.

Asoma brought this suit for damage to the coils under the charter party in the Southern District of New York. The court (Swain, *J.*) concluded that the bills of lading, and not the charter party, were the governing contract of carriage and that their South Korea forum selection clause controlled; it therefore dismissed the case. *See* Fed.R.Civ.P. 12(b). For the reasons that follow, we conclude that in a suit under the charter party brought by Asoma as charterer under that contract, charging SK Shipping with breach of the terms of that contract, SK Shipping is bound to the terms of its contract, including the forum selection clause specifying that litigation for cargo damage be brought in the Southern District of New York. To the extent the district court came to the contrary conclusion, we reverse and remand for further proceedings. As to the other portions of the court's opinion, we affirm.

## BACKGROUND

As is often the case in intercontinental ocean shipping, the litigants are connected to a network of affiliated companies.[1] Asoma is apparently affiliated with four companies—MUR London, Metall und Rohstoff Shipping London USA Corp. ("MUR USA"), Macsteel International Far East Limited ("Macsteel Far East"), and Macsteel International USA Corp. ("Macsteel USA")—each of which played a role in the purchase and shipment of the coils.

---

* The Honorable William K. Sessions III, United States District Court Judge for the District of Vermont, sitting by designation.

1. As the Supreme Court recently stated: "In intercontinental ocean shipping, carriers may not know if they are dealing with an intermediary, rather than with a cargo owner. Even if knowingly dealing with an intermediary, they may not know how many other intermediaries came before, or what obligations may be outstanding among them." *Norfolk S. Ry. Co. v. Kirby,* 543 U.S. 14, 34–35, 125 S.Ct. 385, 160 L.Ed.2d 283 (2004).

In late September 1999, Asoma's affiliate Macsteel Far East entered into a contract with Yieh Loong, a Taiwanese steel manufacturer, for the purchase of 10,000 metric tons of steel coils for approximately $2.75 million. A key price term was FOB Kaohsiung, Taiwan, and the steel was to be shipped to the United States during October or November 1999.

MUR London, another Asoma affiliate, entered into the voyage charter party in late December 1999 with SK Shipping. The contract provided for carriage of the steel by SK Shipping from Kaohsiung, Taiwan to three separate ports in the United States, on a ship to be nominated by SK Shipping. The charter party identified SK Shipping as the "time chartered owner," and named the charterer as MUR London "or nominee." Of particular importance here, the parties agreed in Clause 35 that cargo damage claims be litigated in the United States District Court for the Southern District of New York. The pertinent part of Clause 35 reads as follows:

> Any arbitration clause in this contract shall not apply for cargo loss or damage but such claims shall be brought in the United States District Court for the Southern District of New York, to which jurisdiction owners hereby consent.

Clause 9 of the charter party also provided: "The Captain or Agents to sign Bills of Lading at such rate of freight as presented without prejudice to this Charter party." As MUR London's nominee and therefore a party to the contract of charter, Asoma brought this suit in accordance with the stated terms of the contract of charter requiring that suits for cargo damage be litigated in the United States District Court for the Southern District of New York.

On January 6, 2000, in a letter addressed to MUR USA, SK Shipping nominated the *M/V Faros* to carry the steel coils. The *Faros* was a vessel owned by Defendant–Appellant Pelagos Shipping, Ltd. ("Pelagos"), operated by Defendant–Appellant Columbia Shipmanagement Ltd. ("Columbia"), and subchartered to SK Shipping.

On January 11, 2000, Macsteel Far East sold the steel coils to its affiliate Asoma. Payment to Macsteel Far East was conditioned on the production of certain documents, including a "Full Set 3/3 Clean On Board Bills of Lading." Under a section on "loading," the contract also stated that the "[d]etention rate is to be as per charter party," though it did not explicitly reference the December 23, 1999 charter party between MUR London and SK Shipping.

On January 25, 2000, SK Shipping issued twelve bills of lading to Yieh Loong, the manufacturer and seller of the steel. Yieh Loong was designated as the shipper, and the "consignee" was designated as "To Order," rendering the bills negotiable. The front of each bill of lading contained the following statement:

> IN ACCEPTING THIS BILL OF LADING the shipper, Owner and consignee of the goods and holder of this bill of lading expressly accept and agree to all its stipulations exceptions and conditions, whether written, stamped or printed as fully as if signed by such shipper, Owner, consignee and/or holder. No agent is authorized to waive any of the provisions of the within clauses.

Clause 33, on the reverse side, also contained a forum selection clause: "Any claim, dispute, suit or action concerning goods carried under this Bill of Lading, whether based upon breach of contract, tort or otherwise shall be brought before the Seoul District Court."

The front of each bill of lading also stated that the "FREIGHT PAYABLE AS PER CHARTER PARTY," and that the

freight was payable at "DESTINATION". Asoma claims that in February 2000 it paid the freight charges for the steel coil cargo (roughly $264,000) directly to SK Shipping's bank account specified in Clause 18 of the charter party, in February 2000. The bills of lading were assigned by Yieh Loong to the purchaser, Macsteel, which in turn assigned them to Asoma.

Asoma claims that, at some point after Yieh Loong delivered the steel coils onto the M/V Faros at the dock in Kaohsiung, Taiwan, and before the March 2000 delivery of the coils to the United States, the coils were damaged by seawater. Asoma seeks in excess of $140,000 in damages from Defendants–Appellees SK Shipping, Pelagos, and Columbia.

On February 21, 2001, MUR London executed an Assignment, Ratification and Nomination, which nominated Asoma as the charterer under the charter party, assigned all MUR London's rights in the charter party to Asoma, and ratified Asoma's upcoming litigation against SK Shipping.

In May 2001, Asoma brought this suit against SK Shipping, Pelagos, and Columbia in the Southern District of New York. The defendants promptly moved to dismiss by reason of the South Korea forum selection clause in the bills of lading. The district court granted this motion because Asoma's original complaint mentioned only the bills of lading, not the charter party. The court refused to grant Asoma leave to amend its original complaint. *See Asoma Corp. v. M/V FAROS*, No. 01CIV3853 (LTS)(THK), 2001 WL 1588929, at *2 (S.D.N.Y. Dec. 12, 2001). We reversed in an unpublished summary order, and remanded to the district court to allow Asoma the opportunity to amend its complaint to bring its claims under the charter party.

*See Asoma Corp. v. SK Shipping Co.*, 53 Fed.Appx. 581, 584 (2d Cir.2002).

Asoma then amended its complaint to assert its claims under the contract of charter, and to rely on that contract's forum selection clause. The defendants moved for judgment on the pleadings based on the South Korea forum selection clause in the bills of lading. The district court ultimately dismissed the Amended Complaint, ruling that the controlling contracts of carriage were the bills of lading issued by SK Shipping to Yieh Loong, which had been negotiated to Macsteel Far East and ultimately to Asoma. The district court essentially concluded that the contract of charter between SK Shipping and Asoma was irrelevant, because the bills of lading were the contract of carriage. *See Asoma Corp. v. M/V Faros*, No. 01Civ3853 (LTS)(THK), 2005 WL 2333634, at *5–6 (S.D.N.Y. Sept. 21, 2005). The court dismissed Asoma's claims against Pelagos and Columbia for the same reasons, and "for the further reason that neither Columbia nor Pelagos is a party to the voyage charter." *Id.* at *6.

This appeal followed.

## DISCUSSION

### I. Asoma's claims against SK Shipping

■ Turning first to Asoma's claims against SK Shipping, we conclude that the district court should have enforced the New York forum selection clause of the charter party. As explained below, we reach this conclusion because SK Shipping entered into a contract with MUR London and its "nominee" Asoma to litigate cargo damage claims brought under the charter party in the Southern District of New York. SK Shipping cannot escape that contractual commitment by issuing bills of lading containing a different forum selection clause to the shipper of the cargo. A

carrier which enters into a contract of charter cannot unilaterally alter the terms of its contract by the simple expedient of issuing its bills of lading containing inconsistent terms upon its receipt of the cargo.

## A. Standard of Review

On an appeal of a district court's dismissal based on a forum selection clause, we review factual findings for clear error and legal conclusions *de novo. See Evolution Online Sys., Inc. v. Koninklijke PTT Nederland N.V.,* 145 F.3d 505, 508 (2d Cir.1998).

The Supreme Court has not specifically designated a single clause of Rule 12(b) as the "proper procedural mechanism to request dismissal of a suit based upon a valid forum selection clause," nor have we. *New Moon Shipping Co., Ltd. v. MAN B & W Diesel AG,* 121 F.3d 24, 28 (2d Cir. 1997); *see Carnival Cruise Lines, Inc. v. Shute,* 499 U.S. 585, 589, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991) (enforcement of forum selection clause sought through summary judgment motion); *M/S Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 4, 9–19, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972) (failing to specify whether analysis applied to defendant's motion to dismiss on basis of lack of jurisdiction or *forum non conveniens* ). Formerly, our Circuit "characterized the mechanism by which a party sought enforcement of a forum selection clause as a 'motion to decline jurisdiction.' " *New Moon Shipping,* 121 F.3d at 28; *see, e.g., Wm. H. Muller & Co. v. Swedish Am. Line, Ltd.,* 224 F.2d 806, 807 (2d Cir.1955), *overruled on other grounds by Indussa Corp. v. S.S. Ranborg,* 377 F.2d 200 (2d Cir.1967); *Hernandez v. Koninklijke Nederlandsche Stoomboot Maatschappij N.V.,* 252 F.Supp. 652, 653 (S.D.N.Y.1965). Prior to *New Moon Shipping,* courts in our Circuit entertained motions to dismiss based on a forum selection

clause as if brought under Rule 12(b)(1) for lack of subject matter jurisdiction, *see AVC Nederland B.V. v. Atrium Inv. P'ship,* 740 F.2d 148, 152 (2d Cir.1984), or under Rule 12(b)(3) for improper venue, *see Paterson, Zochonis (U.K.) Ltd. v. Compania United Arrows, S.A.,* 493 F.Supp. 626, 629 (S.D.N.Y.1980).

■■■■ In *New Moon Shipping* we refused to pigeon-hole these claims into a particular clause of Rule 12(b). Drawing on the Supreme Court's decision in *M/S Bremen,* we noted that the "burden [is] on the plaintiff, who brought suit in a forum other than the one designated by the forum selection clause, to make a 'strong showing' in order to overcome the presumption of enforceability." *New Moon Shipping,* 121 F.3d at 29. This case is somewhat different. It is not that Asoma has sued in a forum other than the one designated by the forum selection clause. It is rather that two contracts—the charter party and the bills of lading—designate two different fora. The plaintiff contends the governing contract is the charter party and has sued in the forum designated by that contract. The defendant contends the governing contract is set forth in the bills of lading which requires suit in a different court. What we meant in New Moon Shipping is that, where one party has shown an apparently governing forum selection clause, the party opposing litigation in the so designated forum must make a strong showing to defeat that contractual commitment. Where, as here, the two sides have put forth different contracts, each containing a forum selection clause designating a different forum, and the parties do not dispute the facts which gave rise to those two conflicting contracts, the court must decide as a matter of law on the agreed facts which forum selection clause governs. Once the parties agree on the facts, the issue is no longer one of

burden of proof, the issue is one of law which the court must decide.

### B. Charter parties and bills of lading

██ "A charter party is a specific contract, by which the owners of a vessel let the entire vessel, or some principal part thereof, to another person, to be used by the latter in transportation for his own account, either under their charge or his." *The New York*, 93 F. 495, 497 (E.D.N.Y. 1899), *aff'd* 113 F. 810 (2d Cir.1902), *quoted in Nichimen Co. v. M.V. Farland*, 462 F.2d 319, 329 n. 7 (2d Cir.1972). A bill of lading is a document normally issued by the shipowner when goods are loaded on its ship, and may, depending on the circumstances, serve as a receipt, a document of title, a contract for the carriage of goods, or all of the above. *See In re Marine Sulphur Queen*, 460 F.2d 89, 103 (2d Cir.1972).[2] Charter parties and bills of lading are interpreted using the ordinary principles of maritime contract law. *See Battery S.S. Corp. v. Refineria Panama, S. A.*, 513 F.2d 735, 738 (2d Cir.1975).

As the district court properly noted, we have long recognized that

> [a]s between the original parties to it a bill of lading never affects the terms of the charter party.... The usual practice is for the master, or agent of the ship-

owner, to give bills of lading for the cargo, although it may be shipped under a charter party. When the charterer himself ships the goods these bills of lading operate as receipts for them, and also as documents of title which he can negotiate, and thereby constructively transfer possession of the goods. But they do not, as between the shipowner and the charterer, operate as new contracts, or as modifying the contract in the charter party.... [W]here there is a charter party [a bill of lading] never supersedes any unequivocal provisions [of the charter party].... The rule is that where there is a charter party the bill of lading operates as the receipt for the goods, and as a document of title passing the property of the goods, but not as varying the contract between the charterer and the shipowner.

*The Fri*, 154 F. 333, 336–37 (2d Cir.1907) (internal quotation marks and citations omitted).[3]

██ The general rule that, "as between the parties to a charter party, a bill of lading is a mere receipt and not also part of the contract of carriage, has long been recognized to be a flexible one, *i.e.*, subject to contractual modification by the parties." *M.V. Farland*, 462 F.2d at 328 n. 4. But this does not mean that an agree-

**2.** As explained in the leading treatise on Admiralty law:

> A bill of lading is, in the first instance and most simply, an acknowledgment by a carrier that it has received goods for shipment. Secondly, the bill is a contract of carriage. Thirdly, if the bill is negotiated ... it controls possession of the goods and is one of the indispensable documents in financing the movement of commodities and merchandise throughout the world.

Grant Gilmore & Charles L. Black, Jr., *The Law of Admiralty* 93 (2d ed.1975).

**3.** *See Associated Metals & Minerals Corp. v. S/S Jasmine*, 983 F.2d 410, 413 (2d Cir.1993) ("Bills of lading [ ] have less significance in

private carriage agreements, in which the parties look primarily to the charter party to determine their rights and responsibilities."); *In re Marine Sulphur Queen*, 460 F.2d at 103 (a bill of lading does not function as the contract of carriage "for the shipper and the carrier when there is a charter party containing the terms of the carriage contract"); *see also Cargill Ferrous Int'l v. SEA PHOENIX MV*, 325 F.3d 695, 702 (5th Cir.2003) ("[T]he contractual terms in the voyage charter, which were actively negotiated by the parties, are far more probative of the intentions of the parties than is a bill of lading which is normally considered a receipt....").

ment as to the terms of carriage, such as a charter party, can be *unilaterally* altered by the carrier's issuance of a bill of lading with terms more favorable to itself. *See N. Pac. Ry. Co. v. Am. Trading Co.*, 195 U.S. 439, 463, 25 S.Ct. 84, 49 L.Ed. 269 (1904) ("The railroad company has no power alone to alter [the original] contract, and it could not alter it by simply issuing a bill of lading, unless the other party assented to its conditions and thereby made a new and different contract."); *Hellenic Lines, Ltd. v. Embassy of Pakistan*, 467 F.2d 1150, 1154 (2d Cir.1972) ("To hold that language in the bill of lading prevails over inconsistent language in the freight contract would permit Hellenic to change unilaterally the terms of an already existing contract."). *Cf. Ingersoll Milling Mach. Co. v. M/V Bodena*, 829 F.2d 293, 300–01 (2d Cir.1987) ("To allow a carrier after the fact to impose on the shipper an unauthorized change of terms would run counter to the general proposition that without its contrary agreement, a shipper is entitled to expect [adherence to the terms in the contract of carriage].").

■ Notwithstanding the existence of a charter party, which serves as the contract of carriage as between the parties to it, the bill of lading may serve as the contract of carriage defining the rights and obligations as between the carrier and another person not entitled to rely on the charter party. *See SEA PHOENIX MV*, 325 F.3d at 702 ("A bill of lading's character changes when it is negotiated."). As we explained in *The Fri*:

> Where the bill of lading has been transferred for value [by the charterer] to third persons who are strangers to the charter party, its terms become very important. It then constitutes an undertaking on the part of the shipowner with the holders, which is independent of the charter party, except so far as that is expressly incorporated in it.

*The Fri*, 154 F. at 336–37 (internal quotation marks and citations omitted).[4]

## C. Which forum selection clause controls?

SK Shipping agreed to the terms of the charter party to which Asoma became a party—the charterer—when it was nominated by MUR London.[5] Under the charter party, as charterer, Asoma brings suit for cargo damage. The charter party expressly provides that cargo damage claims "shall be brought in the United States District Court for the Southern District of New York." Asoma is entitled to rely on that term of its contract of charter with SK Shipping.

As made clear by *The Fri* and other authorities cited above, Asoma's right to rely on the forum selection clause in its contract of charter with SK Shipping is not affected by the fact that SK Shipping issued bills of lading to Yieh Loong (who we presume for purposes of this appeal shipped the cargo), which specified a dif-

---

**4.** For example, an owner of goods might charter a boat through a charter party with the boat owner, and would receive a bill of lading as a receipt when its goods are loaded on the boat. The charter-owner of the goods might then sell the goods to a third party while they are in transit on the boat, transferring the bill of lading to the third party. Because the third party who now owns the goods was not a party to the charter party, the bill of lading, and not the charter party, would become the contract of carriage of the goods between the third party and the boat owner. *See, e.g., Son Shipping Co. v. De Fosse & Tanghe*, 199 F.2d 687, 688 (2d Cir.1952).

**5.** We note that SK Shipping devotes a significant portion of its brief to arguing that the district court did not clearly err in determining that Asoma was not a party to the charter party. The district court, however, made no such determination.

ferent forum for litigation, nor by the fact that Asoma demonstrates ownership of the cargo through these bills of lading, which were assigned to it. To be sure, if the suit for cargo damage were brought against the carrier by an assignee of the bills of lading who was not a party or beneficiary to the contract of charter, the bills of lading would in all likelihood serve as pertinent contracts of carriage and their forum selection clause would no doubt govern. Nonetheless, in a suit for cargo damage brought under a charter party by the charterer against the grantor of the charter, the charterer is entitled to rely on the contract of charter, notwithstanding that the charterer may also rely on the bills of lading to establish its ownership and the carrier's receipt of the goods. The customary rule permits the charterer to enforce the terms of the charter party notwithstanding its reliance for other purposes on bills of lading issued by the chartered owner which contain different provisions. *See, e.g., S/S Jasmine,* 983 F.2d at 413; *In re Marine Sulphur Queen,* 460 F.2d at 103; *The Fri,* 154 F. at 337. SK Shipping, as a party to the charter party, cannot unilaterally alter the terms of its contract with the charterer simply by issuing bills of lading with inconsistent provisions. *See N. Pac. Ry. Co.,* 195 U.S. at 462–63, 25 S.Ct. 84; *Hellenic Lines, Ltd.,* 467 F.2d at 1154. *See also* Grant Gilmore & Charles L. Black, Jr., *The Law of Admiralty* 219 (2d ed.1975).

The district court reached the contrary conclusion by reasoning along the following lines: Yieh Loong shipped the cargo, under the bills of lading. The bills of lading specify Yieh Loong's rights as against SK Shipping; they prescribe suit in South Korea. These bills of lading were negotiated and eventually assigned to Asoma. Asoma claimed the cargo by presenting the bills of lading. According to the district court's reasoning, Asoma's right to claim for damage to cargo was necessarily governed by the bills of lading and not the charter party, because the bills of lading were the contract of carriage.

The district court explicitly acknowledged the conventional rule cited in *The Fri:*

> As between the original parties to [the charter party] a bill of lading never affects the terms of the charter party.... [The bills of lading] do not, as between the shipowner and the charterer, operate as new contracts, or as modifying the contract in the charter party.... The rule is that where there is a charter party the bill of lading operates as the receipt for the goods but not as varying the contract between the charterer and the shipowner.

154 F. at 336–37. The court however seemed to assume that this rule would apply only if the charterer were also the shipper of the goods. The court stated, for example, that "[t]he foregoing rule simply gives primacy to the terms specifically negotiated ... between the shipowner and a charterer *who is also the shipper of the goods....*" *Asoma Corp.,* 2005 WL 2333634, at *5 (emphasis added). The court further explained that Asoma's attempt to demonstrate that it may sue under the terms of the charter party fails because Asoma's evidence is insufficient to show that it "was the shipper of the goods." *Id.* The court, in other words, apparently believed that when a charterer negotiates a contract with the owner of a vessel, chartering the vessel to carry cargo, the terms of that contract will not apply as between those parties unless the charterer itself consigns the goods to the carrier. There is no such rule. The court misconstrued some loose language in *The Fri* and other cases. The pertinent passage in *The Fri* includes a sentence, which

says, "When *the charterer himself ships the goods* these bills of lading operate as receipts for them." 154 F. at 336 (emphasis added); *see also In re Marine Sulphur Queen*, 460 F.2d at 103 ("A bill of lading ... does not perform [as a contract for the carriage of goods] for the shipper and the carrier where there is a charter party containing the terms of the carriage contract."). These and other similar passages, however, did not mean to impose a rule that a charterer may rely on its contract of charter only if it is the entity that ships the goods, and not when, as in the present case, the goods are shipped to it by its seller, in which circumstances it would be bound by whatever terms the carrier placed in the bills of lading.[6] Such a rule would have no logical justification.

■■■ The language of *The Fri* and other such cases referring to a charterer "who is also the shipper of the goods" was merely descriptive, not prescriptive. It is often the case that the charterer of a vessel is also the entity that consigns the cargo to the vessel, and remains in possession of the bills of lading, on which it relies in the suit to show its ownership. The import of these cases is that, as between the parties to a contract of charter, the bill of lading does not supersede the terms of the con-

tract of charter even though the charterer is also the holder of the bill of lading and relies on it to show its ownership of the cargo.

■■■ The question before us—the propriety of the New York forum—is easily resolved under the traditional principles governing such cases. Asoma was the charterer under a contract of charter made with SK Shipping as owner. SK Shipping in that contract had agreed that any claim of cargo damage would be litigated in the Southern District of New York. Asoma was therefore entitled to bring its claim for cargo damage in the Southern District of New York. The fact that the carrier's obligations would have been governed by a different contract had suit been brought under the bills of lading by a stranger to the contract of charter does not alter the fact that SK Shipping agreed in the charter contract to be bound by its terms in disputes with the charterer.[7] We accordingly reverse the district court's dismissal of Asoma's suit against SK Shipping.

## II. Asoma's claims against Pelagos and Columbia

■■■ Asoma also appeals from the district court's grant of the motions of Pelagos, the owner of the *Faros*, and Columbia,

---

**6.** An important reason why cargo interests negotiate a voyage charter is precisely because they wish to bargain for terms more favorable than the carrier-favoring terms of the carrier's standard bill of lading, which will be issued to whoever consigns the cargo to the carrier. *See Nissho–Iwai Co. v. M/T Stolt Lion*, 617 F.2d 907, 914 n. 7 (2d Cir. 1980) (noting that vessel owners have a greater bargaining advantage in bills of lading than in charter parties); *see also Mathiesen v. M/V Obelix*, 817 F.2d 345, 348 (5th Cir.1987) ("[O]ne chartering an entire vessel enjoys sufficient bargaining clout to resist overreaching by the shipowner.").

**7.** A carrier may have different contracts with different parties covering its carriage of the

same goods. A party interested in the cargo may enter into a charter party with the carrier under which the carrier agrees to terms which vary from those stated in its bill of lading. In a dispute between those parties, the charter party generally will govern, although the bill of lading may serve as the receipt demonstrating that the goods came into the carrier's possession and as a document of title. On the other hand, in a suit brought by a holder of the bill of lading who is not entitled to claim the benefit of a distinct contract of charter, the bill of lading serves also as the contract of carriage. *See, e.g., MacSteel Int'l USA Corp. v. M/V JAG RANI*, No. 02 Civ. 7436(JGK), 2003 WL 22241785 (S.D.N.Y. Sept.30, 2003).

its manager, for the dismissal of Asoma's claims against them. Pelagos and Columbia offered the same arguments as SK Shipping that the South Korea forum selection clause of the bills of lading should govern. The district court explained that the reasons for granting their motions were "the same as stated above [justifying the dismissal as against SK Shipping] and ... the further reason that neither Columbia nor Pelagos is a party to the voyage charter.... Rather, any claims against them, as carriers, are governed by the bills of lading, which designate the Korean forum." *Asoma Corp.*, 2005 WL 2333634, at *6.

As we have explained above, the district court's reasons for rejecting the forum selection agreement of the charter party were not valid as to SK Shipping, because, under the charter party, SK Shipping had contracted with Asoma to be bound by those terms. When applied to Pelagos and Columbia, however, those reasons were valid. Pelagos and Columbia were not parties to the charter party. Its terms, including its forum selection clause, were not applicable to a dispute between them and Asoma.

On appeal, Asoma does not argue that Pelagos and Columbia are bound to the charter party. Asoma argues, rather, that the bills of lading, with their South Korea forum selection clause, are also inapplicable to Pelagos and Columbia. Thus, according to Asoma, there is no forum selection agreement covering its suit against Pelagos and Columbia, so that it is free to sue them wherever they may be found.

▮ Generally, when chartered owners such as SK Shipping have been authorized by remote owners in the chain of charter

to issue bills of lading "for and on behalf of the master," the bills of lading are deemed also to specify the rights and responsibilities of these remote owners. *See Gans S.S. Line v. Wilhelmsen*, 275 F. 254, 262 (2d Cir.1921); *Maize Bd. of the Republic of S. Afr. v. M/V Courageous I*, 685 F.Supp. 420, 422 (S.D.N.Y.1988); 2 Thomas J. Schoenbaum, *Admiralty & Maritime Law* § 11–7 (3d ed. 2001) ("A contract of carriage with an owner may be entered into either directly between the parties, or by virtue of a charterer's authority to bind the owner by signing bills 'for the master.' If it is shown ... that the signature 'for the master' was without the authority of the shipowner, the latter is not personally bound...."). Asoma seeks to justify its argument that the bills of lading do not apply to Pelagos and Columbia by asserting that SK Shipping had not been authorized by Pelagos to issue bills of lading "on behalf of the Master." *See, e.g., Tuscaloosa Steel Corp. v. M/V Naimo*, No. 90 Civ. 2194, 1992 WL 477117, at *3 (S.D.N.Y. Sept.14, 1992).

▮ However, this contention was not raised in the district court. Pelagos and Columbia moved for dismissal in the district court on the theory that they were protected from defending the suit in the Southern District of New York by the South Korea forum selection clause of the bills of lading.[8] Had Asoma wished to contest their right to rely on the terms of the bills of lading by challenging SK Shipping's authority to bind them to bills of lading, the time to do so was in the district court proceedings. *See New Moon Shipping*, 121 F.3d at 29 (discussing burden to present evidence showing why a forum selection clause that applies to its claims

---

8. The bills of lading include a "Himalaya Clause," which protects agents, such as Columbia, to the same extent that the owner is protected. *See Am. Home Assurance Co. v.* *Hapag Lloyd Container Linie GmbH*, 446 F.3d 313, 317–18 (2d Cir.2006); 1 Thomas J. Schoenbaum, *Admiralty & Maritime Law* § 10–8 (3d ed.2001).

should not be enforced). If the present record is inadequate to disclose whether SK Shipping was authorized to bind Pelagos and Columbia, it is because Asoma did not make these essentially factual arguments at the time when any necessary evidence could have been developed.

## CONCLUSION

The dismissal of Asoma's claims against SK Shipping is REVERSED. The dismissal of Asoma's claims against Columbia and Pelagos is AFFIRMED. The case is REMANDED for further proceedings consistent with this opinion.