# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
May 11, 2011

No. 10-20524

Lyle W. Cayce
Clerk

QT TRADING, L.P.,

Plaintiff–Appellant

v.

M/V SAGA MORUS; ATTIC FOREST AS; PATT, MANFIELD & COMPANY, LTD.; SAGA FOREST CARRIERS INTERNATIONAL AS; ARTHUR J. GALLAGHER & COMPANY,

Defendants–Appellees

Appeal from the United States District Court
for the Southern District of Texas

Before HIGGINBOTHAM, DENNIS, and PRADO, Circuit Judges.

EDWARD C. PRADO, Circuit Judge:

This appeal stems from an action brought by Appellant QT Trading, L.P. ("QT") for rust damage to its steel pipes that is alleged to have occurred during their transport from Dalian, China, to Houston, Texas. QT appeals the district court's grant of summary judgment to *in personam* Defendants Attic Forest AS ("Attic"), Saga Forest Carriers International AS ("Saga"), and Patt Manfield & Co., Ltd. ("Patt") on QT's claims for damages under the Carriage of Goods at Sea Act ("COGSA"), 46 U.S.C. § 30701 note (Carriage of Goods by Sea), and for negligent bailment of its goods. For the following reasons, we affirm.

No. 10-20524

## I. FACTUAL AND PROCEDURAL BACKGROUND

In March of 2008, QT purchased over 800 bundles of steel pipe from a Chinese company. The selling company contracted with Daewoo Logistics Corp. ("Daewoo") for the ocean transport of the pipe from Dalian to Houston. Daewoo chartered the vessel M/V SAGA MORUS, the *in rem* Defendant, under a two-year time charter party agreement ("Charter Party") from Defendant Saga. Signed on November 7, 2007, the Charter Party refers to Saga as "owners," although Saga had itself chartered the vessel from Defendant Attic, the actual owner of the ship. The Charter Party provides that "the Charterers are to load, stow[,] trim[,] secure and discharge the cargo at their expense under the supervision of the Captain, who if requested to do so by Charterers, is to sign Bills of Lading for cargo as presented, in conformity with Mate's and Tally Clerk's receipts." It also notes that the charterers (Daewoo) or its agents were

> authorized to sign on Master's and/or on Owners' behalf Bills of Lading as presented in accordance with the Mate's or Tally Clerk's receipts without prejudice to Owners' rights under this Charter Party, but Charterers [were] to accept all consequences that might result from Charterers and/or their agents signing Bills of Lading not adhering to the remarks in Mate's or Tally Clerk's receipts.

Defendant Patt served as the ship's operator and technical manager, charged with employing the officers and crew and operating the ship in accordance with the charterer's instructions.

On April 6, 2008, the Captain of the SAGA MORUS authorized Daewoo's agent to "sign on [his] behalf all bills of lading covering the present shipment . . . according with mate's receipt and the P&I remarks." On April 7, 2008, he also authorized Daewoo to sign bills of lading on his behalf, with the condition that Daewoo ensure "that the original Bills of Lading are issued in strict conformity with the Mate's Receipts, i.e., all remarks of quantity and condition which are

2

No. 10-20524

contained in the Mate's Receipts must be entered on the Bills of Lading prior to signing."

Prior to Daewoo's loading of the pipes onto the SAGA MORUS, Attic's Protection & Indemnity ("P&I") Club hired an independent cargo surveyor. On April 6, 2008, the surveyor issued a "Preshipment Cargo Condition Report" ("Preshipment Report") to the ship's Master, finding damage to a large number of the pipe bundles. On April 5–6, the shipper issued documents entitled "Shipping Order." Undisputed summary-judgment evidence establishes that these documents were Mate's Receipts. These documents describe the goods as "clean on board," but incorporate the Preshipment Report by noting "as per P&I surveyor report." The bills of lading signed by Daewoo's agent on April 5–6, however, fail to incorporate or mention either the Mate's Receipts or the Preshipment Report, instead noting that the goods were "clean on board." Both the April 5 and April 6 bills of lading were signed "As Agent For The Carrier Daewoo Logistics Corp."

After the SAGA MORUS arrived in Houston on May 19, 2008, QT hired a cargo inspector to examine the pipes upon discharge from the vessel. The inspector notified QT that the cargo had been "discharged in a damaged and non-conforming condition" after finding damage including surface rust on some bundles and other damage due to "rough, careless, and/or improper handling" and "faulty stowage."

On March 10, 2009, QT filed suit in the Southern District of Texas *in rem* against the SAGA MORUS, and *in personam* against Daewoo, Saga Forest, Attic, and Patt. Daewoo declared bankruptcy and never appeared or filed an answer in this action. On June 24, 2010, the district court dismissed without prejudice QT's claims against Daewoo in light of the latter's bankruptcy filing. On March 1, 2010, QT seized the SAGA MORUS when it docked in Los Angeles and obtained a Letter of Undertaking to secure its claim before releasing the

vessel. On March 10, 2010, QT filed an *in rem* and *in personam* suit against the Defendants in this case in the Central District of California as well. On November 5, 2010, that court entered an order granting summary judgment to Defendants on QT's *in rem* claim against the M/V SAGA MORUS based on the existence of a valid forum selection clause placing venue in Hong Kong.

On April 19, 2010, the *in personam* Defendants filed a motion for summary judgment, and on June 15, 2010, the district court granted the motion, dismissing QT's COGSA, bailment, and maritime negligence claims. The district court held that QT had made no showing that either Attic or Patt were parties to the Bills of Lading or otherwise had authorized Daewoo to sign on their behalf. While the district court found that Saga Forest had authorized Daewoo to sign on its behalf, it nevertheless held that Daewoo exceeded the scope of this authorization by not incorporating or referencing the Mate's Receipts. Therefore, it held that QT's COGSA claim failed because none of the Defendants were COGSA carriers. As to its bailment claim, the district court rejected it out of hand, finding that QT had presented no legal authority and failed to show that any Defendant was a "bailee" with "exclusive possession" of the cargo.

QT timely appealed the district court's grant of summary judgment on its COGSA and bailment claims.[1]

## II. STANDARD OF REVIEW

We review "the grant of summary judgment de novo, applying the same standards as the district court." *Canal Ins. Co. v. Coleman*, 625 F.3d 244, 247 (5th Cir. 2010) (citation omitted). Summary judgment is appropriate when

---

[1] QT had also initially appealed the district court's (1) May 21, 2010 denial of QT's motion to transfer venue; (2) June 22, 2010 denial of QT's motion for reconsideration and to sever and transfer its *in rem* claim; and (3) July 12, 2010 dismissal of QT's *in rem* claim against the vessel pursuant to Federal Rule of Civil Procedure 4(m). Shortly before argument was heard in this case, and based on the dismissal of its *in rem* claim in Central District of California, QT withdrew these issues from its appeal.

No. 10-20524

"there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Factual controversies are construed in the light most favorable to the nonmovant, but only if both parties have introduced evidence showing that an actual controversy exists." *Espinoza v. Cargill Meat Solutions Corp.*, 622 F.3d 432, 437–38 (5th Cir. 2010) (quoting *Lynch Props., Inc. v. Potomac Ins. Co. of Ill.*, 140 F.3d 622, 625 (5th Cir. 1998)).

## III. DISCUSSION

### A. COGSA Liability

QT contends that the district court erred when it granted summary judgment to Defendants on its COGSA claim by finding that none of the Defendants were COGSA "carriers" and thus could not be liable for damages under the statute. QT refers to all three *in personam* Defendants collectively as "Owners" and argues that they are all COGSA "carriers." QT concedes that Defendants were not named parties to the Bills of Lading between the shipper and Daewoo. It argues, nonetheless, that Daewoo had the authority to bind Defendants as COGSA "carriers" because the Master gave Daewoo authority to sign bills of lading on his behalf, and because the charter party gave the Master authority to sign bills of lading on behalf of Defendants. QT acknowledges that Daewoo's agent signed the Bills of Lading without incorporating or referencing Mate's Receipts or the Preshipment Report. Rather, it claims that no Mate's Receipts existed to be incorporated into the Bills of Lading and that the Preshipment Report was not issued until April 11, several days after the signing of the Bills of Lading on April 5–6.

A cargo owner may only recover under COGSA from the "carrier" of goods. *See Thyssen Steel Co. v. M/V KAVO YERAKAS*, 50 F.3d 1349, 1351 (5th Cir. 1995). COGSA defines a "carrier" as "the owner or the charterer who enters into a contract of carriage with a shipper," and notes that a "contract of carriage"

5

applies only to those contracts "covered by a bill of lading or any similar document of title." COGSA § 1. A contract of carriage with an owner need not be direct; it may also be established "by virtue of the charterer's authority to bind the vessel owner by signing the bill of lading 'for the master.'" *Thyssen*, 50 F.3d at 1352 (citing *Pac. Emp'rs Ins. Co. v. M/V GLORIA*, 767 F.2d 229, 236 (5th Cir. 1985)). Thus, in order to bind the owner and confer COGSA carrier status, the charterer must have authority to sign the bill of lading "for the Master," and the Master must have authority to sign bills of lading for the shipowner. *See Pac. Emp'rs*, 767 F.2d at 237 (citing *EAC Timberlane v. Pisces, Ltd.*, 745 F.2d 715, 719 (1st Cir. 1984)). QT has the burden to prove that Defendants were parties to the contracts. *Thyssen*, 50 F.3d at 1352 (citing *Assoc. Metals & Minerals Corp. v. SS PORTORIA*, 484 F.2d 460, 462 (5th Cir. 1973)).

### 1.    Attic & Patt

While QT's claims against Saga require more extensive discussion, its claims against Attic and Patt are easily dismissed. The district court correctly found that QT failed to present any evidence that either Defendant was a party to the Bills of Lading or otherwise authorized Daewoo to sign on its behalf. In order to assert a direct claim against Attic or Patt, QT would have to establish privity of contract, *see Thyssen*, 50 F.3d at 1353, something it does not attempt and cannot establish here. Further, while a shipper can establish an indirect claim based on establishing the authority of (1) the charterer to sign on behalf of the Master and (2) the Master's authority to bind the owner, QT has made no such claim against Attic or Patt here. All references to the "Master" and the "owner" here relate to Daewoo's Charter Party with Saga; QT has presented no evidence that the Master was an agent of Attic or Patt or that either gave the Master any authority to bind it.

**2.   Saga**

QT has successfully borne its burden to show that (1) Daewoo's agent had authority to sign on behalf of the Master and (2) Saga gave the Master authority to sign Bills of Lading.  Nonetheless, QT's argument that Saga is a COGSA carrier fails for two reasons.

First, even though Daewoo's agent had authority to sign the Bills of Lading on behalf of Saga, it failed to actually do so.  Both Bills of Lading indicate that the agent signed "As Agent For The Carrier Daewoo Logistics Corp," in a box labeled "Signed for the Carrier."  This is in contrast to *Pacific Employers*, where this Court affirmed the district court's determination that the shipowner was a COGSA carrier by virtue of the charterer's agent signing bills of lading on its behalf.  767 F.2d at 237–38.  In that case, the charterer's agent signed the bills of lading "as agents by authority of the master."  *Id.* at 233; *see also Thyssen*, 50 F.3d at 1352 n.3 (noting that the bills of lading were signed "for the master").  Further, in beginning its analysis, the *Pacific Employers* Court noted that the owner's liability "depends on the effect of the signature caption 'by authority of the *master*.'" *Id.* at 237 (emphasis added).

Here, the agent's signature indicates that it signed on behalf of *Daewoo*, not the Master.  Moreover, the Charter Party between Daewoo and Saga does not appear to indicate that the authority of the Master is necessary to sign the Bills of Lading; the relevant provision notes that "the Captain, *who if requested to do so by [Daewoo]*, is to sign Bills of Lading for cargo as presented."  Therefore, Saga is not a party to the Bills of Lading because Daewoo's agent did not sign them on behalf of the Master. *Accord Man Ferrostaal, Inc. v. M/V AKILI*, ---F. Supp. 2d---, 2011 WL 207968, at *8 (S.D.N.Y. Jan. 24, 2011) (holding that the owner and manager of a vessel "cannot be held personally liable" as COGSA carriers where "the bill of lading clearly names only [the charterer] as carrier and does not purport to be a document signed 'for the master'"; *Mahroos v. S/S*

*TATIANA L*, No. 86-CV-6706, 1988 A.M.C. 757, 760 (S.D.N.Y. 1988) ("In general, a shipowner is not personally liable for a bill of lading issued by a charterer which does not indicate the name of the owner and which is not signed by or for the Master."); *The Poznan*, 276 F. 418, 432 (S.D.N.Y. 1921) (L. Hand, J.) (holding that a vessel's owner "was not liable under the bills of lading because these did not purport to bind it; they issued in the name of the charterer").

Second, even if the language of the signature were not determinative, Saga is not a COGSA carrier because Daewoo's agent exceeded the authority granted to it by the Master by failing to sign the Bills of Lading in conformity with the Mate's Receipts. Both the Charter Party and the Captain's authorizations to sign on his behalf granted Daewoo and its agent only the authority to sign the Bills of Lading in conformity with the Mate's Receipts. The Charter Party even explicitly notes that "Charterers [ ] accept all consequences that might result from Charterers and/or their agents signing Bills of Lading not adhering to the remarks in Mate's or Tally Clerk's receipts." Because Daewoo's agent signed the Bills of Lading as "clean on board," it failed to incorporate or reference the Mate's Receipts, which themselves incorporated the Preshipment Report by noting "as per P&I surveyor report."

While this Court has yet to address this situation, other courts have found that when the signing party exceeds its authority in signing bills of lading not in accordance with the Master's instructions, the owner cannot be held liable as a COGSA carrier. *See Cargill Ferrous Int'l v. M/V SUKARAWAN NAREE*, No. 96-CV-1705, 1997 WL 537992, at *4 (E.D. La. Aug. 26, 1997) (holding that charterer exceeded its authority in signing bills of lading not in accordance with Mate's Receipts when required to do so by the Master's instructions and therefore the shipowner was not liable as a COGSA carrier); *Tuscaloosa Steel Corp. v. M/V NAIMO*, No. 90-CV-2194, 1992 WL 477117, at *3 (S.D.N.Y. Sept. 14, 1992) (same). We find this reasoning persuasive and hold that Daewoo's

No. 10-20524

agent exceeded his authority by failing to sign the Bills of Lading in conformance with the explicit requirements of the Charter Party and of the Master.

QT argues that Daewoo's agent was unable to sign in conformity with the Mate's Receipts because (1) there were no Mate's Receipts, and (2) the Preshipment Report was not issued until April 11, while the Bills of Lading were signed on April 5–6. As to the first argument, Defendants have offered undisputed evidence—an affidavit from Patt director Man Tak Yung—that establishes that the documents labeled "Shipping Orders" were in fact the corresponding Mate's Receipts for the Bills of Lading. QT has not come forward with any proper summary-judgment evidence to rebut this. QT's "conclusory allegations" and "unsubstantiated assertions" that the Shipping Orders are not Mate's Receipts are insufficient to create a genuine dispute of fact on this point. *See Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 399 (5th Cir. 2008).

As to the second argument, the allegation that the Preshipment Report was not issued until April 11 is immaterial.[2] Each of the two Mate's Receipts was issued on the same day as its corresponding Bill of Lading. Both the Charter Party and the Master's Authorization require Daewoo to sign the Bills of Lading in accordance with the Mate's Receipts. Daewoo failed to do so. Even if we assume *arguendo* that Daewoo's obligation to sign the Bills of Lading in accordance with the Preshipment Report would be excused if the Preshipment Report had not yet been prepared, summary judgment for Defendants remains proper. The fact that Daewoo failed to sign the Bills of Lading in accordance with the Mate's Receipts is sufficient, standing alone, to establish that Daewoo exceeded its authority. Additionally, QT's contention that Defendants are

---

[2] We note that the summary-judgment evidence shows that the initial Preshipment Report was issued on April 6, and the Preshipment Report issued on April 11 was a supplemental Preshipment Report.

9

estopped from making this argument because they had possession of and withheld the Mate's Receipts and Preshipment Report is unfounded; QT fails to offer any evidence of this beyond its conclusory assertion.

Therefore, we affirm the district court's grant of summary judgment to Defendants on QT's COGSA claims.

## B.   Bailment

QT contends that even if Defendants are not liable under COGSA, the district court nonetheless erred in dismissing its bailment claim against Saga. It claims that QT had an implied contract of bailment with Saga because Saga knowingly took exclusive possession of QT's cargo and had exclusive possession at the time of its loss.  QT argues that Daewoo acted as an agent for Saga during shipping, and that in so doing, Saga retained exclusive possession of the cargo. Because Saga had exclusive possession, QT urges, Saga's negligence is presumed because the cargo was returned to QT in damaged condition.

We have previously described bailment as "the delivery of goods or personal property to the bailee in trust, under express or implied contract, which requires the bailee to perform the trust and either to redeliver the goods or to otherwise dispose of the goods in conformity with the purpose of the trust." *Thyssen*, 50 F.3d at 1354–55 (citing *T.N.T. Marine Serv., Inc. v. Weaver Shipyards & Dry Docks, Inc.*, 702 F.2d 585, 588 (5th Cir. 1983)).  A claim of bailment does not arise under admiralty law unless (1) "delivery to the bailee is complete" and (2) "he has exclusive possession of the bailed property, even as against the property owner." *Id.* (citing *T.N.T. Marine Serv.*, 702 F.2d at 588).

For the same reasons we denied the cargo owner's bailment claim in *Thyssen*, we affirm the district court's denial of QT's bailment claim here.  In *Thyssen*, we held that the cargo owner's bailment claim against the shipowner failed because the bills of lading and Clause 8 of the charter party indicated that the charterer also had possession of the cargo, thereby destroying exclusivity.

*Id.* There, Clause 8 contained similar language to Clause 8 of the Charter Party here, both noting that the Charterers had responsibility for loading, stowing, securing, and discharging the cargo "at their expense under the supervision of the Captain." *Id.* at 1355; *see also Man Ferrostaal, Inc.,* 2011 WL 207968, at *9 ("[W]hen a charterer has taken responsibility for stowage of cargo onboard a ship, the ship owner does not have exclusive possession of the property and so cannot be held liable as a bailee.") (citations omitted). Thus, the Charter Party provision destroys QT's exclusive-possession argument because it is nearly identical to the provision we used in *Thyssen* to find a lack of exclusive possession. Additionally, Daewoo's agent signed the Bills of Lading on behalf of Daewoo, further undermining the claim that Saga had exclusive possession of the cargo.

Because QT has failed to show that Saga had exclusive possession of the cargo, we affirm the district court's grant of summary judgment on QT's bailment claim.

## IV. CONCLUSION

For the foregoing reasons, we affirm the district court's dismissal of QT's COGSA and bailment claims.

AFFIRMED.

11