**11-0486-cv(L)**
**MAN Ferrostaal, Inc. v. M/V Akili,**

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2011

(Argued: January 9, 2012      Decided: December 6, 2012)

Docket No. 11-0486-cv(L), 11-0567-cv(XAP)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MAN FERROSTAAL, INC.,
          Plaintiff-Appellee-Cross-Appellant,

                    v.

M/V AKILI, her engines, boilers, tackle, etc.,
          Defendant-Cross-Claimant-Appellant-Cross-Appellee

AKELA NAVIGATION CO., LTD., ALMI MARINE MANAGEMENT SA,
          Defendants-Third-Party Plaintiffs-Cross-
          Claimants-Appellees,

SM CHINA CO., LTD.,
          Defendant-Third-Party Defendant-Cross-Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

B e f o r e:   WINTER, KATZMANN, and LYNCH, Circuit Judges.

     Appeal from a judgment of the United States District Court for the Southern District of New York (Denise Cote, Judge), after a bench trial, holding the M/V Akili liable in rem for damage to cargo shipped aboard the vessel. Appellants argue that the district court erred in holding that the vessel was liable in rem, and in holding that the Carriage of Goods by Sea Act applied

1

to the vessel as a "carrier" under that act.  Man Ferrostaal cross-appeals the judgment for failing to hold Almi Marine Management and Akela Navigation Co. liable in personam for the damage under a bailment theory.  We affirm.

VINCENT M. DEORCHIS, Deorchis & Partners, LLP, New York, NY, for Defendant-Cross-Claimant-Appellant-Cross-Appellee.

STEVEN P. CALKINS, Kingsley Kingsley & Calkins, Hicksville, NY, for Plaintiff-Appellee-Cross-Appellant.

WINTER, Circuit Judge:

The M/V Akili, its owner, Akela Navigation Co., and manager, Almi Marine Management, appeal from Judge Cote's decision, after a bench trial, holding the M/V Akili liable in rem for damage to cargo shipped aboard the vessel.  Appellants claim that the district court erred in holding the vessel liable in rem.  Man Ferrostaal ("Ferrostaal") cross-appeals from the holding that Almi Marine Management ("Almi") and Akela Navigation Co. ("Akela") are not liable in personam under a bailment theory.  We write at length to clarify both the issues and our analysis, which differs somewhat from that of the district court.  However, we affirm.

BACKGROUND

Ferrostaal's business is accepting orders of steel from customers in the United States, procuring steel from international suppliers, and then arranging for the steel's transportation to the customer. The cargo at issue here was 9,960 "thin-walled" steel pipes, manufactured in China and sold to Ferrostaal pursuant to a purchase order dated March 23, 2006 ("Purchase Order"). Ferrostaal in turn sold the pipe to McJunkin Appalachian Oilfield of West Virginia and arranged for it to be shipped to New Orleans.

A series of charters and sub-charters of the Akili were executed before the cargo was loaded aboard. On June 19, 2006, Akela time-chartered the Akili to Seyang Shipping, Ltd., which in turn was permitted to sublet the vessel for all or any part of the time covered by the charter (the "Time Charter Party"). The Time Charter Party specified that all bills of lading issued under the charter would incorporate "the General Clause Paramount or U.S. or Canadian Clause Paramount whichever applicable as attached."[1] Thereafter, Seyang sub-chartered the vessel to S.M.

---

[1] The USA Clause Paramount is a clause designating the Carriage of Goods by Sea Act, or COGSA, as the controlling law with respect to the rights and liabilities of parties to a bill of lading.

China for the voyage from Shanghai to Houston and then to New Orleans. Prior to chartering the Akili from Seyang, S.M. China had executed a part-cargo charter (the "Voyage Charter Party") with Ferrostaal for the carriage of the thin-walled pipes from Shanghai to New Orleans. The Voyage Charter Party did not identify the vessel on which the cargo was to be shipped, stating instead that the ship was "TBN" -- "to be named" in landlubbers' lingo -- by S.M. China.

The Voyage Charter Party placed responsibility for loss "caused by improper or negligent stowage, or discharge, or care of the goods" on the "Owners" of the vessel. It further specified that "[s]towage is to be under the Master's supervision and responsibility as Owners' agent." The "Owner" was defined as S.M. China. It also contained a "free-in-and-out" provision that stated that the handling of cargo was to be "free of risk . . . to the vessel."

The Voyage Charter Party also contained a "Clause Paramount" that stated in part, "[n]otwithstanding any other provisions in this contract, any claims for loss or damage to cargo shall be governed by the Hague-Visby rules as if comprehensively applicable by law." The Hague-Visby rules are an international convention that are in all pertinent respects literally identical to rules established by the Carriage of Goods by Sea Act, 46

4

U.S.C. § 30701 ("COGSA" or "the Act").  This is no coincidence because the convention requires signatory nations to pass legislation embodying these rules.

A bill of lading was issued by China Ports International Shipping Agency Ltd., as the agent of S.M. China, to Zhongqing, the shipper, and then was transferred to Ferrostaal through banking channels pursuant to the "cash against documents" term of the Purchase Order.  The bill of lading contained a Clause Paramount that incorporated the Hague rules.[2]

The pipe was carried from China to New Orleans aboard the Akili.  Upon arrival in New Orleans, it was discovered that the steel pipes had been placed at the bottom of a cargo hold and

---

[2]The Clauses Paramount in the Bill of Lading reads as follows:

> This Bill of Lading shall be subject to the Hague Rules contained in International Convention for the Unification of Certain Rules of Law Relating to Bills of Lading, dated at Brussels the 25th August, 1924, or the corresponding legislation of the flag state of the ship.  If the stipulations of the bill of lading are wholly or partly contrary thereto, this bill of lading shall be read as if such stipulation or part thereof, as the case may be, were deleted.

Because the contract of affreightment is the Voyage Charter Party for reasons stated infra, the differences between the Voyage Charter Party Clause Paramount and the Bill of Lading Clause Paramount do not affect the disposition of this case.

damaged when heavier pipes were placed on top.  The pipes were repaired by Houston Tubulars, Inc., which was paid $286,078.32 by Ferrostaal.

On July 9, 2007, Ferrostaal filed the present action in rem against the Akili and in personam against Akela, Almi, and S.M. China.  Akela and Almi filed a cross-claim against S.M. China.[3]  After a bench trial, Judge Cote held the Akili liable in rem[4] and

---

[3]Akela and Almi filed a motion to dismiss for lack of personal jurisdiction on January 23, 2009, which was stayed pending trial on the issues of in rem and in personam liability.

[4]On February 9, 2009, Ferrostaal made an emergency motion to sever the in rem action and transfer it to the Eastern District of Louisiana because the Akili was expected to call at a Louisiana port.  The motion was granted.  Then, the Owners' insurance company wrote a Letter of Undertaking seeking to avoid the arrest.  Pursuant to a Stipulation and Consent Order entered by the parties, the in rem action was transferred back to the Southern District of New York, where it was assigned a new case number.  Although the in rem and in personam claims were tried together, disposed of by a single opinion and order, and resolved by a combined judgment bearing both case numbers, the two cases were never formally consolidated.

Because the Akili filed its notice of appeal only under the docket number of the in personam action, Ferrostaal argues that we lack jurisdiction to consider appellant's arguments insofar as they pertain to the in rem action.  We are unpersuaded.  The Akili timely filed notice in the district court of its intent to appeal the "judgment, order or decree" entered by the district court as it pertains to the in rem action.  28 U.S.C. § 2107(a).  Ferrostaal received notice of the Akili's intent to appeal, and it claims no prejudice as a result of the Akili's failure to file the notice in both actions or to caption it with both district court case numbers.  Accordingly, the Akili's oversight is not fatal to its appeal.  See Marrero Pichardo v. Ashcroft, 374 F.3d 46, 54-55 (2d Cir. 2004); Conway v. Village of Mount Kisco, N.Y., 750 F.2d 205, 211-12 (2d Cir. 1984).

dismissed the claims for in personam liability against Akela and Almi.  This appeal and cross-appeal followed.

DISCUSSION

We review the district court's findings of fact for clear error and its conclusions of law de novo.  Mobil Shipping & Transp. Co. v. Wonsild Liquid Carriers Ltd., 190 F.3d 64, 67 (2d Cir. 1999).  Mixed questions of law and fact are reviewed de novo.  White v. White Rose Food, 237 F.3d 174, 178 (2d Cir. 2001).

a)  The Appeal

Boiled down, the parties dispute whether:  (i)  an in rem proceeding rendering the Akili liable for damage to, or loss of, cargo is unavailable in this matter because a vessel is not a "carrier" within the meaning of COGSA and (ii) the free-in-and-out provision in the Voyage Charter Party purportedly absolving the Akili of in rem liability is enforceable.  We hold that the first issue is essentially irrelevant because a vessel's in rem liability for damage to cargo exists under maritime common law, not COGSA, for a violation of a carrier's contractual or statutory -- COGSA's -- obligations.  We resolve the second issue against enforcement of the free-in-and-out provision so far as it might be construed to prevent in rem liability of the vessel.  In doing so, we do not decide whether COGSA applied as a matter of

7

law to this voyage because, even if it did not, the Voyage Charter Party's Clause Paramount contractually incorporates the Hague-Visby rules prohibiting a carrier from contracting for a waiver of its obligations regarding damage to cargo. See 46 U.S.C. § 30701 Note § 3(8).

1. The Vessel as a COGSA "Carrier"

COGSA sets out the obligations of "carriers" involved in the shipment of goods into the United States from international ports. It requires ocean carriers to "Properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried," id. § 30701 Note § 3(2), and forbids carriers from contracting out of these obligations. Id. § 30701 Note § 3(8); see also Sogem-Afrimet. Inc. v. M/V Ikan Selayang, 951 F. Supp. 429, 442-43 (S.D.N.Y. 1996), aff'd, 122 F.3d 1057 (2d Cir. 1997) ("COGSA does not permit the carrier to divest itself of the duty to insure the proper stowage of the cargo."). COGSA defines a "carrier" to mean "the owner, manager, charterer, agent, or master of a vessel," 46 U.S.C. § 30701, including "the owner or the charterer who enters into a contract of carriage with a shipper." Id. at Note § 1(a).

Appellant argues that because a "vessel" is not a carrier under COGSA, the Akili cannot be liable in rem for damage to, or loss of, cargo. We disagree. COGSA assumes the existence of the

8

in rem proceeding rather than creates it. Section 3, the crux of the Act, sets out duties applicable only to carriers but is entitled "Responsibilities and Liabilities of Carrier and Ship." (emphasis added). The very title of Section 3 thus assumes that maritime law supplies in rem liability coextensive with carrier liability.[5]

Well before enactment of COGSA and its predecessor, the Harter Act, maritime law held ships liable in rem for cargo damage due to improper stowage. The Water Witch, 66 U.S. 494, 500 (1862) ("The ship having received the cargo and carried it . . . is estopped to deny her liability to deliver in like good order as received . . . ."); Demsey & Assoc., Inc. v. S.S. Sea Star, 461 F.2d 1009, 1014 (2d Cir. 1972) ("Every claim for cargo damage creates a maritime lien against the ship which may be enforced by a libel in rem."), abrogated on other grounds by Seguros Illimani S.A. v. M/V Popi P, 929 F.2d 89 (2d Cir. 1991); Pioneer Import Corp. v. Lafcomo, 49 F.Supp. 559, 561-62 (S.D.N.Y. 1943), aff'd, 138 F.2d 907 (2d Cir. 1943) ("A lien arises against the ship for damage to cargo caused by improper stowage."); see also Gilmore & Black, The Law of Admiralty § 3-45 at 165 (1957).

_____

[5]The only portion of Section 3 that applies directly to ships is Paragraph 8, which prevents parties from contracting around the ship's coextensive liability. § 30701 Note § 3(8), discussed infra.

*In rem* liability is derived from a pre-COGSA maritime law doctrine to the effect that, once cargo is aboard a vessel, the vessel is deemed to have impliedly ratified the underlying contract of affreightment and is answerable for nonperformance.[6]

---

[6]The district court used a combination of maritime law and COGSA to find the Akili liable *in rem*. *See* *Man Ferrostaal v. M/V Akili*, 763 F. Supp. 2d 599, 612 (S.D.N.Y. 2011) ("The Akili, by setting sail with the cargo, is deemed to have ratified the bill of lading, and therefore is liable *in rem* as a [COGSA] carrier." (emphasis added)). We do not adopt this reasoning.

The "implied ratification" doctrine gives rise directly to *in rem* liability. It does not render a vessel a carrier under COGSA. *See, e.g.*, *Demsey*, 461 F.2d at 1015. The ratification doctrine is directly traceable to pre-COGSA maritime law precedent. For example, the seminal implied ratification case, *The Esrom*, 272 F. 266, 270 (2d Cir. 1921), cites *The Schooner Freeman v. Buckingham*, 59 U.S. 182 (1855), a case that preceded COGSA and its predecessor, the Harter Act. In *Freeman*, the Supreme Court stated:

> [W]hen the general owner [of a vessel] intrusts the special owner with the entire control and employment of the ship, it is a just and reasonable implication of law that the general owner assents to the creation of liens binding upon his interest in the vessel, as security for the performance of contracts of affreightument made in the course of the lawful employment of the vessel. The general owner must be taken to know that the purpose for which the vessel is hired, when not employed to carry cargo belonging to the hirer, is to carry cargo of third persons; and that bills of lading, or charter-parties, must, in the invariable regular course of business be made, for the performance of which the law confers a lien on the vessel.

*Id.* at 190.

Demsey, 461 F.2d at 1014-15; see also Kraus Bros. Lumber Co. v. Dimon S.S. Corp., 290 U.S. 117, 121 (1933).  The Akili, by setting sail with the cargo on board, impliedly ratified the contract of affreightment between S.M. China and Ferrostaal.  See Freeman, 59 U.S. at 190 (noting that where a shipowner allows a special owner to carry cargo of third persons, the law confers a lien for the performance of bills of lading or charter parties).[7]

As between S.M. China and Ferrostaal, the contract of affreightment was the Voyage Charter Party rather than the bill of lading.[8]  A carrier may not alter its contractual obligations

_____

[7]Akili argues that Insurance Company of North America v. S/S American Argosy, 732 F.2d 299 (2d Cir. 1984), demands a different conclusion.  It does not.  American Argosy governs bills of lading issued by non-vessel operating common carriers ("NVOCCs"), which "do not . . . own or charter the ships that actually carry the cargo."  Id. At 301.  We recognized that the ratification doctrine applies where a bill of lading has been issued "by a charterer of the vessel," and decline to extend the doctrine to situations involving NVOCCs.  Id. at 303-04.  Unlike an NVOCC, S.M. China operated the ship for the purpose of carrying cargo pursuant to a charter agreement, as authorized by the ship's owner, and the ratification doctrine therefore applies.  See Freeman, 59 U.S. at 190.

[8]The fact that a vessel is operated under charter does not absolve it of in rem liability.  Demsey, 461 F.2d at 1014; Pioneer Import, 138 F.2d at 908 ("[T]he maritime lien against the ship . . . obtains whether or not [the ship] was under charter.").  Even if a charterer enters into a contract of affreightment unauthorized by the vessel owner, the vessel is liable in rem for non-performance even if the vessel owner is absolved of in personam liability.  See Demsey, 461 F.2d at 1015; see The Water Witch, 66 U.S. at 500 (holding ship liable for improper stowage by charterer despite master's refusal to sign the bill of lading because "the ship having received the cargo and carried it to the consignees . . . is estopped to deny her liability to deliver in like good order as received.").

11

to a shipper under a Voyage Charter Party by issuing a bill of lading with different terms, Asoma Corp. v. SK Shipping Co., 467 F.3d 817, 823-24 (2d Cir. 2006), albeit when the bill of lading is negotiated to a good faith third party, which did not occur here, the bill governs the third party's rights.  Id. at 824.

To sum up, even if a vessel is not a "carrier" within the meaning of COGSA, maritime law renders vessels liable in rem for a carrier's violations of its obligations.  Therefore, while COGSA, if applicable, may affect or alter a carrier's obligations and thereby determine the outcome of an in rem proceeding against a carrier's vessel, the in rem remedy is a creature of maritime law, not COGSA.

2.  Enforceability of a Waiver of the Vessel's In Rem Liability

The applicability of COGSA in this appeal arises in a second and different context.  Appellants argue that the free-in-and-out provision of the Voyage Charter Party relieves the vessel of liability for improper stowage.  The free-in–and-out provision reads:

> The cargo to be loaded, stowed, lashed,
> secured, and dunnaged free of risk and
> expenses to the vessel in accordance with
> local regulations for steel cargoes, under
> deck only.

Appellee disagrees with this interpretation of the provision, but we need not resolve that issue in light of our

12

disposition. As discussed above, COGSA and its predecessor, the Harter Act, were meant to modify, not displace, _in rem_ liability under maritime law. A principal modification was to prohibit carriers from contracting out of their obligations under maritime law and out of their vessel's exposure to _in rem_ liability. § 30701 Note § 3(8).

As the classic admiralty treatise states, "The general law of maritime carriage made the public carrier of goods by sea absolutely responsible for their safe arrival," with a few exceptions. Gilmore & Black, _supra_ § 3-22 at 139. "When the bill of lading came into general use as a receipt for goods and document of title, [however], shipowners [and other carriers] . . . began to set out on the face of the bill various 'exceptions' [to liability]." _Id._ § 3-22 at 140. "Bills came to include stipulations that the carrier was not to be liable even for the results of his own negligence or that of the ship's people. . . Instead of being absolutely liable, irrespective of negligence, [the carrier] enjoyed an exemption from liability, regardless of negligence, as wide as his bargaining position enabled him to contract for." _Id._ § 3-23 at 142. The dissatisfaction of American cargo interests with these exemptions from liability prompted Congress to enact the Harter Act of 1893, the predecessor to COGSA. _Id._ § 3-24 at 142-43.

13

COGSA, therefore, prevents international ocean carriers from contracting out of certain specified obligations, including the responsibility to stow cargo properly. See Nichimen Co. v. M.V. Farland, 462 F.2d 319, 327 (2d Cir. 1972); see also § 30701 Note § 3 (setting forth carrier duties); id. Note § 3(8) (preventing carriers and ships from contracting out of the duties set forth therein). These obligations are deemed as a matter of law to be incorporated by reference into every bill of lading where COGSA applies. See § 30701 Note ("Every bill of lading . . . in foreign trade, shall have effect subject to the provisions of this chapter."); Gilmore & Black, supra § 3-25 at 145.

The relevant COGSA provision reads:

> Any clause . . . in a contract of carriage relieving the carrier or the ship from liability for loss or damage to or in connection with the goods, arising from . . . obligations provided in this section . . . shall be null and void and of no effect.

§ 30701 Note § 3(8).

The Hague-Visby Convention sets out an identical rule -- in haec verba -- and the parties here have incorporated the Convention and its rules into the Clauses Paramount of the Voyage Charter Party and the bill of lading. If COGSA applies as a matter of law, the free-in-and-out provision is unenforceable insofar as it is a waiver of in rem liability. If the cargo damage rules of Hague-Visby apply as a matter of contract, the same result is reached.

14

The applicability of either approach, however, is not self-evident. Both COGSA and Hague-Visby contain the following provision:

> "[C]ontract of carriage" applies only to contracts of carriage covered by a bill of lading or any similar document of title, in so far as such document relates to the carriage of goods by sea, including any bill of lading or any similar document as aforesaid issued under or pursuant to a charter party from the moment at which such bill of lading or similar document of title regulates the relations between a carrier and a holder of the same.

§ 30701 Note § 1(b); Hague-Visby Rules, Art. I. For convenience sake, we will refer to this provision as "the Applicability Provision" or "Provision".

With regard to the applicability of COGSA as a matter of law, the Applicability Provision has led to a division among American courts. Although the provision does not specifically mention a distinction between public and private carriage, most American courts, including the district court in this case, treat the Applicability Provision as calling for a determination of whether the vessel was engaged in public -- roughly speaking, multiple cargos and shippers -- or private -- again, roughly speaking, a single cargo and shipper -- carriage. Akili, 763 F. Supp. 2d at 609-10; see, e.g., Jefferson Chem. Co. v. M/T Grena, 413 F.2d 864, 867 (5th Cir. 1969); Pac. Vegetable Oil Corp. v.

*M/S Norse Commander*, 264 F. Supp. 625, 627 (S.D. Tex. 1966); *J. Gerber & Co. v. SS Sabine Howaldt*, 310 F. Supp. 343, 350 (S.D.N.Y. 1969), *reversed on other grounds*, 437 F.2d 580 (2d Cir. 1971). As we explained in *Nichimen*, the public-private carriage distinction is a relic of case law applying COGSA's predecessor, the Harter Act. 462 F.2d at 327-28. COGSA's language includes no mention of the public-private distinction but states only that the Act applies "from the moment at which such bill of lading or similar document of title regulates the relations between a carrier and a holder of the same." 46 U.S.C. § 30701 Note § 1(b).

We have sometimes labored to treat charter parties and bills of lading as proxies for private and public carriage, respectively. *See, e.g.*, *Madow Co. v. S.S. Liberty Exporter*, 569 F.2d 1183, 1186-87 (2d Cir. 1978) (arguing that the charter arrangements deemed to be outside the reach of COGSA generally involve engagement of the entire vessel by the charterer for the purpose of shipping his own cargo). In *Nichimen*, however, we noted that there is no necessary correlation between public carriage and carriage pursuant to a bill of lading, or private carriage and voyage charter parties. 462 F.2d at 328. Indeed, in *Nichimen*, we declined to treat the applicability of COGSA as turning on whether the vessel was engaged in public or private

16

carriage, id. at 326-28, finding instead that COGSA applied of its own force because the parties privately agreed that a subsequently-issued bill of lading would govern relations between them.  Id. at 328-29; see Blommer Chocolate Co. v. Nosira Sharon Ltd., 776 F. Supp. 760, 767-68 (S.D.N.Y. 1991) (discussing Nichimen).

Application of the public-private carriage analysis probably favors appellees, as the district court held, because the voyage here involved multiple cargos and multiple shippers.  However, the Fifth Circuit has recently refused to treat carriers that transport multiple shippers' cargo as per se subject to COGSA.  See Tradearbed Inc. v. Western Bulk Carriers K/S, 374 Fed. App'x. 464, 473-74 (5th Cir. 2010).  Instead, it treats the applicability of COGSA as turning on which document -- charter party or bill of lading -- governs relations between the litigants.  See Id. at 374; see also Thyssen, Inc. v. Nobility MV, 421 F.3d 295, 297, 307 (5th Cir. 2005).

Based on the "governing-instrument" standard, appellants argue that COGSA does not apply because the bill of lading here was only a receipt and the Voyage Charter Party -- with the free-in-and-out provision -- is the governing document.  It is established that a bill of lading issued under a charter party is only a receipt when it remains in the hands of the shipper-

17

charterer.  See Nichimen, 462 F.2d at 328; see Asoma, 467 F.3d at 824.  In such a case, the charter party continues to govern relations between the parties.  See Asoma, 467 F. 3d at 823-24; The Fri, 154 F. 333, 336-37 (2d Cir. 1907).  Otherwise, as we have noted, a carrier could alter the terms of the charter party by issuing inconsistent bills of lading.  Asoma, 467 F.3d at 824 (citing Hellenic Lines, Ltd. v. Embassy of Pakistan, 467 F.2d 1150, 1154 (2d Cir. 1972)).  Therefore, the bill of lading becomes the governing instrument only after it is negotiated to a subsequent holder who is not bound by the charter party.  Id.; see Ministry of Commerce v. Marine Tankers Corp., 194 F. Supp. 161, 162-63 (S.D.N.Y. 1960).  The governing instrument test, therefore, would favor appellants' theory of this case.

The adoption of either the "public/private carriage" or the "governing instrument" interpretation of the Applicability Provision might well, therefore, affect the outcome in this matter.  However, we need not resolve the various issues raised because the Voyage Charter Party's Clause Paramount incorporates the Hague-Visby Rules.  Even if COGSA does not apply, therefore, the Voyage Charter Party provides rules regarding the impermissibility of a waiver of in rem liability -- Hague-Visby -- identical to those of COGSA.

18

The Clause Paramount of the Voyage Charter Party reads:

> Notwithstanding any other provisions in this contract, any claims for loss or damage to cargo shall be governed by the Hague-Visby rules as if compulsorily applicable by law, and any other clauses herein repugnant to the Hague-Visby rules shall be null and void and of no force or effect as respects cargo claims. Any clauses in this contract allocating responsibility or risk with respect to loading, stowing, stevedoring, lashing, securing, dunnaging, discharging and delivery shall be deemed to apply only as price terms and shall not be interpreted to alter in any way the responsibilities of the owner and the ship as carriers as defined in the Hague rules as respects claims for cargo loss and damage.

In maritime law, a Clause Paramount "identifies the law that will govern the rights and liabilities of all parties to the bill of lading," Sompo Japan Ins. Co. Of America v. Union Pac. R.R. Co., 456 F.3d 54, 56 (2d Cir. 2006) abrogated on other grounds by Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp., 130 S.Ct. 2433 (2010), and, therefore, supersedes the free-in-and-out provision. See Asoma Corp. v. M/V Seadaniel, 971 F. Supp. 140, 143 (S.D.N.Y. 1997) (finding in a similar case, with similar contractual provisions, that the Clause Paramount governed). Indeed, the Clause Paramount itself states that its provisions govern "[n]otwithstanding any other provisions in this contract."

The Clause Paramount, therefore, incorporates Hague-Visby's prohibitions on waivers of in rem liability into the Voyage

19

Charter Party.  See Koppers Conn. Coke Co. v. McWilliams Blue Line Inc., 89 F.2d 865, 866 (2d Cir. 1937) (noting that the Harter Act [COGSA's predecessor] could apply where the parties to a charter incorporated it, even in instances where it did not apply of its own force); see also Nichimen, 462 F.2d at 328 (finding that parties may render COGSA applicable through contractual arrangements where it does not apply of its own force); see also Thyssen, 421 F.3d at 307(noting that parties may incorporate COGSA into a private carriage agreement using a Clause Paramount).  To the extent that the free-in-and-out provision might relieve the Akili of liability for improper stowage it is, therefore, of no effect because it is prohibited by Hague-Visby.

A final matter.  We noted above a concern that the applicability of Hague-Visby's rules invalidating a waiver of a carrier's obligations was not self-evident.  That was perhaps a tad of an overstatement, but it might be argued that the Voyage Charter Party's contractual incorporation of Hague-Visby includes the Applicability Provision, thereby requiring us to interpret that provision and address the complexities explored above in the interpretation of the identical provision in COGSA.  However, the language of the Clause Paramount in the Voyage Charter Party states that "any claims for loss or damage to cargo shall be

20

governed by the Hague-Visby rules <u>as if cumpulsorily applicable by law</u>." (emphasis added).  This clearly applies the substantive rules in question without regard to the proper interpretation of the Applicability Provision.

We also note that courts have read charter parties incorporating COGSA to incorporate the substantive rules of COGSA governing cargo damage claims whether or not the Applicability Provision would normally render COGSA inapplicable.  See <u>e.g.</u>, <u>Itochu Int'l, Inc. v. M/V Western Avenir</u>, 1997 WL 537698, *5 (E.D. La. 1997); <u>Horn v. CIA de Navegacion Fruco</u>, 404 F.2d 422, 429 n.6 (5th Cir. 1968); <u>Hartford Fire Ins. Co. v. Calmar Steamship Corp.</u>, 404 F. Supp. 442, 445 (W.D. Wash. 1975); <u>cf. Koppers</u>, 89 F.2d at 866.  This seems to us a common sense interpretation.  If COGSA or Hague-Visby apply by force of law, contractual incorporation into a charter party or bill of lading is unnecessary.  Incorporation of the substantive rules governing cargo damage without regard to the Applicability Provision makes sense largely as a protection against judicial rulings that the statute and convention are not applicable as a matter of law.

b.  <u>The Cross Appeal</u>

Ferrostaal argues in its cross-appeal that the district court erred in holding there was no <u>in personam</u> liability for Akela and Almi.  We disagree.

21

One can recover for damage to cargo under COGSA or under a bailment theory.  See Rationis Enters. Inc. of Pan. v. Hyundai Mipo Dockyard, Co., Ltd., 426 F.3d 580, 587 n.3 (2d Cir. 2005).  Ferrostaal does not contend it is entitled to recover under the former theory.  To prevail under the latter theory, there must have been a bailment relationship between the claimant and the ship owner or manager.  A "bailment does not arise unless delivery to the bailee is complete and he has exclusive possession of the bailed property."  Thyssen Steel Co. v. M/V Kavo Yerakas, 50 F.3d 1349, 1355 (5th Cir. 1995).  When a charterer has taken responsibility for stowage of cargo aboard a ship, the ship owner does not have exclusive possession and cannot be held liable as a bailee.  Id. at 1354-55.  Therefore, "no inference of negligence against the bailee arises if his possession of the damaged bailed property was not exclusive of that of the bailor."  United States v. Mowbray's Floating Equip. Exchange, Inc., 601 F.2d 645, 647 (2d Cir. 1979) (citing Pan-Am. Petrol. Transp. Co. v. Robins Dry Dock & Repair Co., 281 F. 97, 107 (2d Cir. 1922)).

Neither Akela nor Almi authorized S.M. China to issue bills of lading on their behalf.  Ferrostaal could not have believed such authorization to exist when the bill of lading named only S.M. China as carrier and did not purport to be a document signed

22

"for the master."  See Demsey, 461 F.2d at 1015 (finding that ship owner could not be made personally liable when charterer had no actual or apparent authority to so bind it); Yeramex Intern. v. S.S. Tendo, 595 F.2d 943, 948 (4th Cir. 1979) (same).[9]

The carriers remained responsible for delivery of the goods and maintained exclusive control and custody over the cargos through agents they hired directly.  Akela and Almi, on the contrary, did not issue receipts for the subject cargo, enter into contracts of carriage with Zhongquing or Ferrostaal, hire the stevedores, or have any agreement to load or to stow the cargo.  See OT Trading, L.P. v. M/V Saga Morus, 641 F.3d 105, 109-10 (5th Cir. 2011) (even though the charter's agent had authority to sign bills of lading on behalf of the ship owner, it signed on behalf of the sub-charterer carrier, and that therefore the owner and the charterer were both in possession of the cargo, and thus did not have exclusive control over the cargo).  Akela and Almi are, therefore, not liable.

---

[9]Both David Crystal, Inc. v. Cunard Steamship Co., Ltd., 339 F.2d 295 (2d Cir. 1964), and Leather's Best, Inc. v. S.S. Mormaclynx, 451 F.2d 800 (2d Cir. 1971) are relied upon by Ferrostaal for the proposition that a bailment exists even when the cargo has been turned over by a carrier to stevedores, despite non-exclusivity.  However, these cases both address the special question of the liability of a carrier to a shipper post-discharge but pre-delivery where the bill of lading is silent as to the exact time at which the carrier's obligations cease.  They are, therefore, inapposite.

## CONCLUSION

We affirm for the reasons stated.